# UNITED STATES DISTRICT COURT
for the
Eastern District of North Carolina

FILED
MAR 2 0 2014
JULIE A. RICHARDS, CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

| | |
|---|---|
| United States of America<br>v.<br>AVIN MARSALIS BROWN (aka Musa Brown)<br>AKBA JIHAD JORDAN<br><br>_Defendant(s)_ | Case No. 5:14-MJ-1181-WW |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __in or about May 2013 to present__ in the county of __Wake__ in the __Eastern__ District of __North Carolina__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2339A | Conspiracy to provide material support and resources, knowing and intending that they be used in preparation for, and in carrying out, a violation of Title 18, United States Code, Section 956 (conspiracy to kill or maim persons outside the United States) |

This criminal complaint is based on these facts:
Refer to attached Affidavit.

☑ Continued on the attached sheet.

_____
Complainant's signature

Joshua Cribbs, FBI Special Agent
_Printed name and title_

Sworn to before me and signed in my presence.

Date: 3/20/14

_____
Judge's signature

City and state: Raleigh, North Carolina

Magistrate Judge
_Printed name and title_

**AFFIDAVIT IN SUPPORT OF AN ARREST WARRANT**

I, Joshua Cribbs, being duly sworn, depose and say:

1. I have been a Special Agent of the Federal Bureau of Investigation (FBI) since October 2010. During that time, I have conducted investigations in counter-terrorism cases in the United States. I have received training conducting criminal and intelligence investigations, conducting searches and seizures, and effecting criminal arrests.

2. The facts set forth in this affidavit are based on knowledge obtained through my participation in this investigation and information provided to me by other law enforcement officers involved in the investigation. This affidavit is being submitted for the sole purpose of establishing probable cause to support the requested criminal complaint. I have set forth only the facts necessary to support this request for a criminal complaint, and I have not included every fact known to me concerning this investigation.

3. Based on the information set forth below, there is probable cause to believe that AVIN MARSALIS BROWN (aka MUSA BROWN) and AKBA JIHAD JORDAN conspired, in violation of Title 18, United States Code, Section 2339A, to provide

material support or resources knowing and intending that they be used in preparation for, or in carrying out, a violation of Title 18, United States Code, Section 956, which makes it a crime to conspire to kill or maim persons outside the United States in violation of Title 18, United States Code, Section 956. The terms "Material Support or resources" as defined by Title 18, United States Code, Section 2339A(b)(1), includes "any property tangible or intangible . . ., [and]personnel (1 or more individuals who may be or include oneself). . . ."

4. On May 27, 2013, BROWN contacted a Confidential Human Source (CHS #1) via email. Meanwhile, on June 7, 2013, another confidential source (CHS #2) met BROWN in person. Thereafter, on June 15, 2013, in response to an email from CHS #1, BROWN indicated that he wished to go overseas and fight, and asked CHS #1 what he should do to prepare to fight. During the course of the investigation, BROWN regularly communicated with CHS #1 using his email accounts and with CHS #2 using his email and social media accounts.

5. On July 15, 2013, BROWN informed CHS #1 via email that he had a few "brothers" who would be very helpful in fisabillah. (The Arabic term "fisabillah" literally means

"for the sake Allah." Your affiant knows based on his training and experience that, among those espousing or pursuing violent jihad, "fisabillah" is a coded term for violent jihad.) In several in-person conversations with CHS #2 during the course of the investigation, BROWN stated that he wanted to go to either Syria or Yemen to fight. Over the course of several months, BROWN became even more insistent on his desire to fight overseas.

6. During the course of the investigation, there were many conversations between CHS #2, BROWN and JORDAN in which they expressed a desire to fight the "kuffar" (non-Muslims) overseas. For example, on September 6, 2013, JORDAN told CHS #2 that he wanted to go to Syria and fight. In many of the conversations, BROWN and JORDAN were both present.

7. In numerous conversations, JORDAN discussed with BROWN the weapons that he has in his possession--including an AK-47--and described how he would not hesitate to use these weapons. JORDAN allowed CHS #2 to handle the AK-47 as well as other weapons owned by JORDAN. Moreover, JORDAN and BROWN frequently discussed weapons and the use of weapons in fighting the kuffar — both overseas and in the United States.

8. JORDAN repeatedly emphasized the need to be physically fit so they could fight overseas, and he conducted physical training for BROWN, the CHS #2 and another person. JORDAN also emphasized the need to train with firearms. JORDAN functioned as a type of physical fitness, firearms and tactics instructor to BROWN and CHS #2.

9. BROWN and JORDAN on numerous occasions discussed the need to obtain passports to travel overseas for purposes of violent jihad. For example, on October 30, 2013, BROWN told CHS #1 via email, that he learned that it takes 2-4 weeks for the passport to arrive.

10. On November 12, 2013, CHS #2 told JORDAN about Basit Sheikh's arrest on terrorism charges. (On November 2, 2013, Basit Sheikh was arrested at Raleigh Durham Airport prior to boarding a flight to Beirut; he is currently awaiting trial in the Eastern District of North Carolina on charges of attempting to travel to Syria to provide material support to a designated terrorist organization.) JORDAN remarked to CHS #2 that he might be next.

11. On November 24, 2013, CHS #2 met with JORDAN. JORDAN commented that he wants to go Syria because he

thinks the caliphate may start there and he wants to be a part of that.

12. On November 29, 2013, JORDAN told CHS #2 he wants to fight in Syria. JORDAN wants to buy bulletproof vests, supplies and more guns. JORDAN asked the CHS to find a place for them to go shooting.

13. On December 30, 2013, CHS #2 met with BROWN and JORDAN. BROWN said he is waiting for his passport. BROWN said he has been talking online to a "brother" in Sham (Syria) who was shot in the foot. BROWN also said he had been talking to another "brother" in Australia who told him to be careful because a lot of "brothers" have been getting caught. BROWN and JORDAN reiterated their desire to travel overseas for jihad. They also discussed their desire to get away from the kuffar here and how Muslims here in the U.S. do not practice true Islam.

14. On the same date, the group went to JORDAN's apartment. JORDAN went into his bedroom and returned to the living room with his AK-47 which he propped against a wall near him. JORDAN was wearing a vest that contained several loaded magazines for the AK-47. Thereafter, JORDAN went back into his bedroom and returned with the Mini-14 (assault rifle), more ammunition and a sword. JORDAN laid all the weapons on the floor to include the AK-47. JORDAN

showed BROWN how to break down the AK-47. JORDAN told BROWN about the capabilities of the weapons and let BROWN handle them. JORDAN told BROWN that he didn't know whether to go overseas for fisibillah or conduct fisabillah here. BROWN agreed with JORDAN. Finally, BROWN and JORDAN talked about getting physically fit and training to be stronger than the kuffar.

15. On numerous occasions in early 2014, BROWN and JORDAN continued discussing fighting in overseas locations and the best routes of travel to those locations. Syria and Yemen were the countries most frequently discussed. JORDAN emphasized the need to fight both overseas and in the United States—but was committed to fighting primarily overseas. BROWN and JORDAN discussed traveling together, but BROWN was always a little bit further along than JORDAN in his efforts to travel.

16. Again, on January 18, 2014, CHS #2 met with JORDAN and BROWN. BROWN, JORDAN and the CHS talked about traveling to Syria and using BROWN's connections to get them there.

17. On January 23, 2014, CHS #2 met with JORDAN at JORDAN's residence. JORDAN told CHS #2 that he wanted to buy more ammunition magazines, because he did not want to

run out of ammunition if he ever got into a fire fight. JORDAN indicated that he would have the money for the passport by the end of February, but may have to borrow money from his mother to pay for the passport. JORDAN told CHS #2 they needed to be careful and not let anyone know about their plans to travel. JORDAN told CHS #2 that if anyone asked about travel, they should say that they are going overseas for vacation or tourism. JORDAN informed CHS #2 he was sleeping on the floor in the kitchen on a blanket with his AK-47 and the Quran beside him like the "brothers" overseas.

18. In January 26, 2014, BROWN told CHS #2 that he had received a United States Passport. JORDAN said he was trying to secure the funds for his passport. JORDAN did, however, have a picture taken for a passport and made an appointment at the local United States Post Office for March 21, 2014, to apply for a passport.

19. In a conversation with CHS #2 on February 7, 2014, BROWN and JORDAN discussed how using the cover of a charity would make it easier to get into Syria.

20. During the course of investigation, both BROWN and JORDAN discussed persons who have been arrested traveling overseas to fight and talked about countermeasures to defeat criminal charges. For example,

they discussed the fact that a criminal case was all about intent and emphasized that they could assert they were traveling for charitable reasons.

21. On February 25, 2014, CHS #2 met with JORDAN outside of JORDAN's residence. JORDAN told CHS #2 that he has been doing research on patterns of "brothers" getting arrested. JORDAN discussed his view that, in Syria, the United States only sides with those fighting for democracy, not Sharia. JORDAN told CHS #2 that BROWN still wants to go to Yemen. JORDAN said he told BROWN that it is easier to get into Syria than Yemen. JORDAN said that if BROWN goes to Syria first he could establish contacts there to get to Yemen.

22. On March 7, 2014, CHS #2 told BROWN he had been watching videos and is uncertain about Syria. BROWN then asked CHS #2 when CHS #2 and JORDAN were supposed to get their passports. CHS #2 told BROWN it would be soon.

23. Later on March 7, 2014, CHS #2 and BROWN met with JORDAN. They spoke about Syria and Yemen and the merits and difficulties of traveling to both locations. JORDAN then stated that he wanted to go to Yemen. CHS #2 commented that the "brothers" in Yemen appear to be more structured. BROWN discussed smuggling methods for bringing

jihad fighters into Yemen from neighboring countries and noted that one needs a visa to enter Yemen. BROWN said it is highly recommended that all Muslims go and fight jihad wherever it is needed. BROWN concluded by saying they need to get out of the U.S., the land of the kuffar, and go fight.

24. On March 9, 2014, CHS #2 went to JORDAN's house. JORDAN told CHS #2 that JORDAN and BROWN had discussed travel to Yemen. JORDAN talked about the need to train for fisabillah. CHS #2 said they do not know what kind of training will be provided if they travel. JORDAN said that he wanted to go shooting but that there was a need to stay low key because of what they had been talking about. JORDAN stated that if they cannot get overseas then their training ground may need to be their battleground. (Your affiant understands this to mean that if they cannot travel overseas for violent jihad then may have to conduct violent jihad in the United States.) CHS #2 asked if JORDAN had enough money for his passport. JORDAN said he did.

25. On March 11, 2014, CHS #2 met with JORDAN and another person. JORDAN said they should die in battle against the kuffar. JORDAN then left with CHS #2 and told

CHS #2 that they need to be ready because it is the kuffar against Islam.

26. On March 16, 2014, BROWN advised CHS #2 that he was leaving on Wednesday, March 19, 2014 for Syria. BROWN did not provide his itinerary but disclosed that he had two contacts in Syria who he met online.

27. On March 19, 2014, BROWN traveled to Raleigh Durham International (RDU) Airport and was arrested. In a Mirandized interview, BROWN stated that he had purchased a ticket to fly to Turkey and that he intended to travel to Syria.

28. Based on the above, I submit that there is probable cause to believe that BROWN and JORDAN have conspired to provide material support and resources knowing and intending that they be used in preparation for, or in carrying out, a violation of Title 18, United States Code, Section 956, which makes it a crime to conspire to kill, or maim persons outside the United States, all in violation of Title 18, United States Code, Section 2339A.

*Joshua Cribbs*
Special Agent Joshua Cribbs
Federal Bureau of Investigation

Sworn to and subscribed to before me this _20th_ day of March, 2014.

WILLIAM A. WEBB
United States Magistrate Judge